UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| AzOx, LLC,<br><br>   Plaintiff,<br><br>v.<br><br>Bloom International Realty, LLC,<br><br>   Defendant. | Case No. 20-cv-00910 (SRN/KMM)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Nahid H. Abuelhassan, Abuelhassan Law, PLLC, 332 Minnesota Street, Suite W810, St. Paul, MN 55101, for Plaintiff.

Daniel P. Doda, Doda & McGeeney, P.A., 421 1st Avenue SW, Suite 300 East, Rochester, MN 55902, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

  This matter is before the Court on a Motion for Summary Judgment [Doc. No. 21] filed by Defendant Bloom International Realty, LLC ("Bloom"). Based on a review of the files, submissions, and proceedings herein, and for the reasons set forth below, the Court **GRANTS** the motion.

**I. BACKGROUND**

  **A. The Owners Representative Agreement Between Bloom and AzOx, LLC**

  In 2015, defendant Bloom, a Delaware corporation headquartered in Abu Dhabi, UAE, entered into a contract with plaintiff AzOx, LLC ("Azox"), a Rochester, Minnesota project management firm, to oversee the permitting and renovation of the Associated Bank

1

Building in downtown Rochester. (Compl. [Doc. No. 1] at ¶ 1–2; 8.) In March of 2015, the two corporations formalized their agreement regarding the work on the Associated Bank Building in a contract entitled "Owner's Representative Agreement" . (Doda Decl., [Doc. No. 24] Ex. 3 at 1.) The parties have now completed this renovation, and Bloom has paid all fees owed to AzOx under the Owner's Representative Agreement. (Compl. at ¶ 10.)

> **B.   The Exclusive Negotiating Rights Agreement Between Bloom and the City of Rochester**

Later in 2015, Bloom became interested in the potential development of a different Rochester property, known as the Riverfront Property. (Carpenzano Decl., [Doc. No. 25] at ¶ 2.) Bloom envisioned the potential for a $200 million development that would include a hotel, parking ramp, public space, and condos. (*Id.*) On June 11, 2015, Bloom entered into a contract with the City of Rochester ("the City") entitled the "Exclusive Negotiating Rights Agreement." (Pl.'s Ex.s [Doc. No. 29] Ex. 13 at 260–262.[1])

The Exclusive Negotiating Rights Agreement outlined the contours of the project and split the proposed project into three phases. In the first phase, Bloom anticipated planning and entering into purchase and development agreements with the City, as well as developing a parking ramp. (*Id.* at 260.) In the second phase, Bloom anticipated constructing a hotel and condos, and in the third phase, Bloom anticipated adding other improvements to the property. (*Id.*)

---

[1] The Court's pinpoint citations to this document are to the page numbers that appear in the CM/ECF banner at the top of Docket Number 29.

### C. Amendment One to the Owners Representative Agreement Between Bloom and AzOx

On September 18, 2015, Bloom and AzOx amended their original contract, the Owner's Representative Agreement, with a one-page document entitled "Amendment-Owner Representative Agreement" ("Amendment One"). (Doda Decl., Ex. 4 at 1.) Amendment One contemplated that AzOx would continue to represent Bloom during the development and construction of the Riverfront Property under the terms of the original Owner's Representative Agreement as amended. (*Id.*) Under Amendment One, AzOx would be responsible for the following: (1) securing the Riverfront Property; (2) obtaining development assistance from the City; (3) securing a development agreement with the City; and (4) performing construction consultation work similar to the work that AzOx had performed on the Associated Bank Building project. (*Id.*) In exchange, Bloom agreed to "reimburse" AzOx a "5% Commission Fee for the Undeveloped Land . . . secured by [Bloom] from the City." (*Id.*) Because the Riverfront Property was appraised to be worth $8 million, AzOx's promised five percent fee was valued at $400,000. (Doda Decl., Ex. 5 at 1.)

### D. The Purchase Agreement Between Bloom and the City

Between August and October of 2018, Bloom entered into another contract with the City entitled the "Purchase Agreement." (*Id.*) The Purchase Agreement set forth details concerning the planned Riverfront Property development, and included a contingency period that ended on December 31, 2018. (*Id.* at 4.) During this contingency period, Bloom could determine, at its discretion, whether its proposed use of the Riverfront Property was

3

feasible.[2] (*Id.* at 3.) Dickson, the co-owner of AzOx, was identified in the agreement as an agent of Bloom, and as someone able to receive notice from the City on behalf of Bloom. (*Id.* at 9.) AzOx alleges it never saw this Purchase Agreement and lacked knowledge of the feasibility contingency. (Pl.'s Opp'n Mem. [Doc. No. 29] at 8.)

In October 2018, the City approved the Riverfront Property development. (*Id.* at 4.) And on November 3, 2018, AzOx sent an invoice to Bloom for $100,000, stating that the "[t]otal contract amount is $400,000.00" and that the $100,000 was "Payment # 1 due." (Pl.'s Ex. 11 at 244.) Bloom did not immediately pay this invoice. (Pl.'s Opp'n Mem. at 1–2.) Instead, Bloom and AzOx began negotiating a second amendment to their contract. (*Id.* at 2.)

### E. Amendment Two to the Owner's Representative Agreement Between Bloom and AzOx

On November 26, 2018, Bloom sent AzOx a contract entitled "Amended and Restated Amendment Agreement (to an Owner Representation Agreement)" ("Amendment Two"). (Pl.'s Ex. 1.) Dickson signed Amendment Two on behalf of AzOx. (*Id.* at 10.) It appears that no Bloom representative signed this version of Amendment Two (*Id.*; Pl.'s Ex. 1.) Amendment Two split the work on the Riverfront Property into two phases. (Pl.'s Ex. 1.) Phase One required AzOx to lead the negotiation with the City for the purchase of the Riverfront Property, and to work with the Mayo Clinic and the Rochester

---

[2] Specifically, the Purchase Agreement provided, "Feasibility of Project. [Bloom] shall have determined, in the sole exercise of its discretion, on or before the Contingency Date, that [Bloom's] intended use of the Real Property is feasible." (Doda Decl., Ex. 5 at 3.)

4

Economic Development Authority to secure development assistance. (*Id.*) Phase Two required AzOx to provide the services set out in clauses 6–9 of the original Owner's Representative Agreement, which included construction management services such as identifying and hiring contractors and overseeing all construction, permitting, and inspection. (Pl.'s Ex. 1 at 6–7; Doda Decl., Ex. 3 at 1–8.) Amendment Two split the payment of $400,000 into two phases as well, with the Phase One payment consisting of a lump sum of $100,000, and the Phase Two payment consisting of a lump sum of $300,000, to be paid in return for "the Phase Two Riverfront Services" in accordance with the "Milestone Schedule" set out in "Exhibit E." (Pl.'s Ex. 1 at 7–8.) Plaintiff alleges that Exhibit E was not attached to this contract. (Pl.'s Opp'n Mem. at 2.) The contract also included a clause stating "[i]f [Bloom] decides not to undertake the Riverfront Development . . . no Phase Two Riverfront Services Fee will be payable by [Bloom]." (Pl.'s Ex. 1 at 9.)

In opposition to the instant motion, AzOx has attached three versions of Amendment Two: (1) the version that AzOx signed on November 26, 2018; (2) a version that only Bloom signed on December 13, 2018; and (3) a version signed by Bloom on December 13, 2018, and AzOx on December 12, 2018. (Pl.'s Ex.s 1–3.) In support of the instant motion, Bloom submitted a fourth version of Amendment Two—a version that both parties signed on December 13, 2018. (Doda Decl., Ex. 6 at 7.)

The December 13, 2018 version of Amendment Two provided by Bloom removed the section discussing Exhibit E from the November 26, 2018 version. (*Id.*; Pl.'s Ex. 1 at 9.) It also contained no reference to "Exhibit E" with respect to the terms of payment, but

5

instead stated, "The Phase Two Riverfront Services Fee shall be paid as a lump sum payment of USD 300,000 which shall be invoiced and paid in 50 monthly Installments of USD 6000 commencing on the last day of the first calendar month following the above referenced 'Closing Date.'" (Doda Decl., Ex. 6 at 6; Pl.'s Ex. 1 at 8.)

### F. The Cancellation of the Riverfront Project

In addition to the work that Bloom and AzOx were doing with the City, another entity called the Pontiac Group announced a planned partnership with the City to develop a hotel project. (Carpenzano Decl., Ex. 1) After receiving news about this new venture between the City and the Pontiac Group, on December 11, 2018, Bloom wrote a letter to the City expressing its concerns. (*Id.*) Bloom was concerned the project would affect the feasibility of its own development project. (*Id.* at 1.) In the letter, Bloom mentioned a market analysis and feasibility study from a consultant group, Newmark Knight Frank ("NKF"), that Bloom had not yet received. (*Id.*) Bloom also reiterated its commitment "to redeveloping the Riverfront Property," but asked that the City allow it to commit only to the first phase of its development plan with the City. (*Id.*) In addition, Bloom requested that the City give it six months to reconfigure its plans for the second phase of the Riverfront Property development which involved a hotel. (*Id.* at 2.) Plaintiff alleges that Bloom did not share a copy of the letter with AzOx or notify it of the letter. (Pl.'s Opp'n Mem. at 11.)

On December 19, 2018, the City responded to Bloom's letter, and included Dickson, co-owner of AzOx, in the response. (Carpenzano Decl., Ex. 2.) The City informed Bloom that it was unwilling to give Bloom six months to reconfigure the second phase of

construction and would not allow Bloom to move forward with the first phase without confirmation that Bloom would complete the second phase. (*Id.* at 2.)

After Bloom received the feasibility report from NKF on December 29, 2018, it cancelled the project. (Carpenzano Decl., Ex. 4; *Id.* Ex. 3; Def.'s Supp. Mem. [Doc. No. 23] at 2.) Bloom sent a letter to the City to terminate the Purchase Agreement, with an effective date of December 31, 2018. (Carpenzano Decl., Ex. 4.)

Over six months later, on July 8, 2019, AzOx sent Bloom an invoice for the full $400,000 that it claimed was due under the terms of Amendment One. (Pl.'s Ex. 4 at 26.) On July 16, 2019, AzOx's counsel followed up with a letter requesting payment, and threatening legal action if Bloom failed to remit payment. (Pl.'s Ex. 5 at 27.) On July 24, 2019, Bloom's counsel responded, stating that it was submitting payment in the amount of $100,000 pursuant to Amendment Two, but the remaining $300,000 that AzOx requested would not be released, as it was not due under Amendment Two until Bloom closed on the Riverfront Property, which it no longer planned to do. (Pl.'s Ex. 6 at 28.)

### G.    Procedural Background

On March 17, 2020, AzOz filed suit in Minnesota state court alleging breach of contract and fraudulent concealment. Bloom removed the case to federal court on April 10, 2020. AzOx seeks $300,000 from Bloom that it claims is due under the terms of their contract, and $900,000 in punitive damages. Bloom now moves for summary judgment on both claims.

## II. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Id.*; *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials and must set forth specific facts in the record showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016); Fed.R.Civ.P. 56(e).

### A. Breach of Contract

#### 1. The Law

In general, contracts consist of binding promises, therefore a breach of contract is "a failure, without legal excuse, to perform any promise that forms the whole or part of the contract." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). Under Minnesota law, a breach of contract claim has four elements: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000)).

8

Contract formation "requires communication of a specific and definite offer, acceptance, and consideration." *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006) (*citing Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626–27 (Minn. 1983)). Consideration ensures "that the promise enforced as a contract is not accidental, casual, or gratuitous, but has been uttered intentionally as the result of some deliberation, manifested by reciprocal bargaining or negotiation." *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 920 (Minn. Ct. App. 2008) (*quoting Baehr v. Penn–O–Tex Oil Corp.*, 104 N.W.2d 661, 665 (Minn. 1960)).

Minnesota law allows parties to alter contracts by mutual consent, *Ulanowski v. Nepper*, No. A10-2198, 2011 WL 3903234, at *2 (Minn. Ct. App. Sept. 6, 2011) (*citing Wilson v. Hayes*, 42 N.W. 467, 471 (Minn. 1889)), and a "modification of a contract does not require a new consideration if it is made while the contract is still executory and there has been no breach. In such case the original consideration attaches to and supports the modified contract." *Brooksbank v. Anderson*, 586 N.W.2d 789, 793 (Minn. Ct. App. 1998) (*quoting Mitchell v. Rende*, 30 N.W.2d 27, 30 (Minn. 1947)). An executory contract is a "contract that has not as yet been fully completed or performed." *Id.* (quoting *Black's Law Dictionary* 570 (6th ed.1990)).

### 2. Analysis

Bloom argues that the parties entered into a binding, unambiguous contract, and no facts give rise to a jury question on the element of breach. Bloom contends that the operative contract between Bloom and AzOx is The Owners Representative Agreement, as amended by Amendment One, and then further amended by Amendment Two. (Def.'s

9

Supp. Mem. at 21.) As evidenced by the clear language of the documents, Bloom argues that there were two phases to the anticipated project, with fees due at the end of each phase. (*Id.* at 21–22.) Phase One involved the negotiation of the contract for the Riverfront Property with the City, while Phase Two contemplated the oversight of the construction of the Riverfront Property. (*Id.*) Finally, Bloom argues that Amendment Two gave Bloom the discretion to decide whether to undertake Phase Two.[3] (*Id.*) Because Bloom chose not to go through with Phase Two, it argues that under the express terms of the parties' agreement, neither party was obliged to perform their respective duties under Phase Two of the contract. (*Id.* at 22.) Specifically, it contends that AzOx was not required to perform

---

[3]   In relevant part, Amendment Two, Clause 21, provides as follows:

(a) The Parties acknowledge and agree that the Phase One Riverfront Services commenced in or about March 2015 and that commencement of the Phase Two Riverfront Services (and payment of the Phase Two Riverfront Service Fee) shall be conditional upon [Bloom]'s decision to enter into formal contractual arrangements with the City of Rochester to take ownership of the property and undertake the Riverfront Development.

(b) On or before 31 December 2018, or such later date as [AzOx and [Bloom] may mutually agree in writing, [Bloom] shall, in its sole discretion, determine whether or not it will enter into formal contractual arrangements with the City of Rochester to take ownership of the Property and undertake the Riverfront Development. . . .

(c) If [Bloom] decides not to undertake the Riverfront Development, no Phase Two Riverfront Services will be performed by [AzOx] and no Phase Two Riverfront Services Fee will be payable by [Bloom].

(Doda Decl., Ex. 6 at 6-7.)

construction management duties, and correspondingly, Bloom was not required to pay the $300,000 Phase Two fee. (*Id.*)

AzOx, however, argues that Amendment Two should not be enforced for several reasons. First, it argues that there was never a meeting of the minds as to the terms of Amendment Two. Second, it contends that the agreement is void for vagueness. Finally, AzOx asserts that Bloom is in breach of the operative terms of their current agreement— Amendment One.

### a. Amendment Two is an Enforceable Contract

AzOx argues that it signed Amendment Two because it relied on Bloom's oral representation that the amendment would allow for the immediate payment of $100,000 and then monthly installments for the remaining $300,000. (Pl.'s Opp'n Mem. at 8–9, 12; Doda Decl., Ex.1 at 4–5.) It argues that the contingency provided for in Clause 21 should not be enforced because AzOx lacked a clear understanding that Bloom had the unilateral discretion to pull out of the construction of the Riverfront Property. (Pl.'s Opp'n Mem. at 8–9, 12.) But under the law, when a party has an opportunity to read a contract, yet signs it without doing so, the party "alone is responsible for his omission". *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875); *Ser Yang v. W. S. Life Assur. Co.*, 713 F.3d 429, 433 (8th Cir. 2013). Nothing in the record suggests that AzOx lacked the opportunity to read the contract before it signed Amendment Two. Its failure to do so does not render the contract void.

Additionally, although several versions of Amendment Two were submitted to the Court,[4] AzOx admits to signing the most recent version on December 13, 2018. (Doda Decl., Ex.1 at 4–5.) As both parties signed this document, Amendment Two is binding on both of them. (Doda Decl., Ex. 6 at 7.)

AzOx also argues that Amendment Two is unenforceable because it is vague and ambiguous. (Pl.'s Opp'n Mem. at 9–12.) AzOx identifies two purported ambiguities within the contract. The first is a reference to "Phase One" and "Phase Two" in the Purchase Agreement that Bloom negotiated with the City, which AzOz argues renders the terms "Phase One" and "Phase Two," as used in Amendment Two, ambiguous. (*Id.* at 9.) The second concerns the payment provision of Amendment Two, which states that the second payment of $300,000 is due as a lump sum, but also says that it will be paid in installments. (*Id.* at 10.)

The terms "Phase One Riverfront Services" and "Phase Two" are clearly defined in the operative agreement, and their use is not ambiguous. (Doda Decl., Ex. 6 at 4–5.) "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Denelsbeck v. Wells Fargo*, 666 N.W.2d 339, 346 (Minn. 2003). "Phase One" is defined in Amendment Two as the negotiation phase of the project, while

---

[4] As noted earlier, in opposition to Defendant's summary judgment motion, AzOx presents three copies of Amendment Two, all signed by different parties on different dates, all of which differ from the signature dates on the version of Amendment Two that Bloom submits. (Pl.'s Ex.s 1–3; Doda Decl., Ex. 6.) All of these documents contain nearly identical language, with the only substantive variation consisting of the schedule for paying the Phase Two fee, should Bloom decide to proceed with the Riverfront Property Development. (see Doda Decl., Ex. 6 at 6–7; Pl.'s Ex. 1 at 8–9.)

12

"Phase Two" is defined as the construction management phase. (*Id.*) The terms "Phase One" and "Phase Two" are not found in the Purchase Agreement, as AzOx claims, but are found instead in the Exclusive Negotiating Rights Agreement, which is a contract AzOx is not a party to, as it is a contract between the City and Bloom. (Doda Decl., Ex. 5; Pl.'s Ex. 13 at 260.) The fact that the terms Phase One and Phase Two are used in this earlier agreement between Bloom and the City does not render ambiguous these terms in a different contract between different parties, particularly where the terms are clearly defined.

The second alleged ambiguity AzOx relies on does not relate to Clause 21, which contains the controlling terms that are at dispute in this litigation. AzOx instead points to Clause 20 of Amendment Two, which states that the Phase Two payment will be paid to AzOx in a lump sum of $300,000, and then also says that this sum will be paid in installments. (Pl.'s Opp'n Mem. at 10; Doda Decl., Ex. 6. at 5–6.) While it may be somewhat unclear how the Phase Two payment should be delivered were the project to go forward, this clause is not in dispute in this litigation. Instead, the controlling terms that govern this dispute are found in Clause 21, (*see supra* n. 3), which gives Bloom the unilateral discretion to determine whether to proceed with the Riverfront Property development. AzOx does not argue that this clause is ambiguous.

In sum, AzOx admits to signing Amendment Two on December 13, 2018. (Doda Decl., Ex. 1 at 4–5.) This agreement included Clause 21(b) which unambiguously allowed Bloom to determine "at its sole discretion" whether to undertake the Riverfront Property

13

development, and Clause 21(d) which unambiguously made payment of the Phase Two fee conditional on Bloom's decision. (Doda Decl., Ex. 6 at 7.)

### b. Bloom Did Not Fail to Perform Under Amendment Two

Finally, AzOx argues that Bloom breached Amendment Two by refusing to close on the Riverfront Property, foreclosing the opportunity for AzOx to earn its fee under Phase Two. "Minnesota law provides that 'contract performance is excused when it is hindered or rendered impossible by the other party.'" *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 671 (8th Cir. 2012) (*citing Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)). Because Bloom allegedly hindered AzOx's performance under Phase Two by failing to proceed with the development of the Riverfront Property, AzOx argues that Bloom is in breach of that contract.

As discussed previously, however, Clause 21 permitted Bloom to elect whether to proceed with performance under Phase Two. (*See supra* n. 3.) Bloom did not hinder or render AzOx's performance impossible—it simply chose a course of action that was permitted and contemplated by both parties under Amendment Two, and which excused both parties' further performance under the contract. Defendant's summary judgment motion is therefore granted with respect to this claim.

### B. Fraudulent Concealment

#### 1. The Law

Generally, "one party to a transaction has no duty to disclose material facts to the other." *McQueen v. Yamaha Motor Corp., U.S.A.*, 488 F. Supp. 3d 848, 857 (D. Minn. 2020) (citing *Graphic Communications Local 1B Health & Welfare Fund A v. CVS*

*Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014)). However, if a party conceals a material fact that is "peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated." *Mooney v. UnitedHealth Group Inc.*, A13-2093, 2014 WL 3558178, at *4 (Minn. Ct. App. July 21, 2014) (citing *Richfield Bank & Trust Co. v. Sjogren,* 244 N.W.2d 648, 650 (Minn. 1976)). But before fraudulent concealment may constitute fraud, there must be a suppression of facts which one party "had a legal or equitable obligation to communicate" to the other, and which the other party is entitled to have communicated to him. *Blue Cross & Blue Shield of N. Carolina v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 542 (D. Minn. 2021) (citing *Zimmerschied v. JP Morgan Chase Bank, N.A.*, 49 F. Supp. 3d 583, 595 (D. Minn. 2014). "A duty to disclose may exist when a fiduciary relationship exists between the parties or when disclosure would be necessary to clarify information already disclosed." *Heidbreder v. Carton,* 645 N.W.2d 355, 367 (Minn. 2002).

    2.    Analysis

Bloom argues that there is simply no evidence in the record that supports AzOx's claim for fraudulent concealment as AzOx voluntarily signed Amendment Two. (Def.'s Supp. Mem. at 22.) Additionally, it argues that Dickson, co-owner of AzOx, was aware of the feasibility clause in the original Purchase Agreement. (*Id.* at 24.) Further, Bloom contends that at the time AzOx signed Amendment Two, Bloom still planned to go through with the Riverfront Property development. (Def.'s Reply [Doc. No. 30] at 9–10.) Bloom

15

points to a December 11, 2018 letter that it sent to the City, reaffirming its desire to proceed with the development project in a feasible way. (Carpenzano Decl., Ex. 1.)

AzOx contends, however, that Bloom did not intend to go through with the purchase at the time AzOx signed Amendment Two. (Pl.'s Opp'n Mem. at 11.) It argues that Bloom drafted Amendment Two in order to avoid its contractual duties under Amendment One and committed fraud by not notifying AzOx that it was reconsidering the project. (*Id.* at 17–18.) AzOx believes that Bloom's failure to notify AzOx of the December 11, 2018 letter to the City creates at least a material factual dispute regarding Bloom's fraudulent intent. (*Id.*)

AzOx identifies evidence of alleged fraudulent intent in a handful of emails between Bloom officers and employees sent prior to the signing of Amendment Two, on November 13 and 14, 2018, that discuss breach of contract. (*Id.* at 14; Pl.s Ex. 17 at 286–292.) But the breach of contract referenced in the emails appears to be a discussion of a potential breach of the Purchase Agreement with the City, not a breach of any agreement with AzOx. (Pl.s Ex. 17 at 286–292.) The Purchase Agreement explicitly did not allow for brokers and brokerage fees, and the CFO of Bloom expressed concern that any payment to AzOx by Bloom would constitute a brokerage fee, which would constitute a breach of the Purchase Agreement. (*Id.* Doda Decl., Ex. 5 at 8.) The CEO of Bloom did write that AzOx "delivered the plot which was [its] obligation" in one email. (Pl.'s Ex. 17 at 287.) However, without more, these emails do not create a genuine and material factual dispute, and are not relevant to the question of whether Bloom committed fraud by not notifying AzOx that it was reconsidering the project.

16

Instead, Bloom's decision not to go through with the project was "the type of loss that was clearly contemplated under the terms of the [contract, and] . . . there is no reason why [those terms] cannot be given full force and effect." *City of Lonsdale*, WL 186251, at *9 (citing *N. Star Ctr., Inc. v. Sibley Bowl, Inc.*, 205 N.W.2d 331, 333 (Minn. 1973)). The parties' agreement clearly contemplated the possibility that Bloom would decline to proceed with the project.

AzOx knowingly bore this risk. It was aware, at the time it signed Amendment Two, that it had limited knowledge as to whether Bloom would elect to proceed with the Riverfront property development, but nevertheless chose to sign Amendment Two; *HealthEast Bethesda Hosp. v. United Com. Traveler s of Am.*, 596 F.3d 986, 988 (8th Cir. 2010); and there was no special relationship under the law between the parties that would have required Bloom to keep AzOx aware of its plans. *See Pugh,* 2005 WL 14922, at *3. AzOx, a sophisticated entity, voluntarily undertook this risk. There is no evidence in the record to establish fraudulent concealment.

### III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 21] is **GRANTED**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 21, 2021

                                            s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge